PELTON *v.* O'KEEFE.

TRESPASS—ACTION—ERROR—AFFIRMANCE BY DIVIDED COURT.

> In this case, involving defendants' liability for trespass under
> section 11206, 3 Comp. Laws, in invading plaintiff's property,
> under public authority, by building a sidewalk projecting
> over the street line, a judgment for defendants is affirmed by
> a divided court; Mr. Justice HOOKER, with whom concur Mr.
> Chief Justice CARPENTER and Justices GRANT and MONTGOM-
> ERY, writing for affirmance on the ground that there is no
> evidence of plaintiff's title to the disputed strip except her
> possession, and that that possession, such as it was, was not
> inconsistent with the recognition of the public rights; and
> Mr. Justice BLAIR, with whom concur Justices McALVAY,
> OSTRANDER, and MOORE, writing for reversal on the ground
> that under the undisputed evidence plaintiff's possession was
> unlawfully invaded, and that the question of title was im-
> material.

Error to St. Clair; Law, J.  Submitted January 4,
1906.  (Docket No. 8.)  Decided July 3, 1906.

Trespass quare clausum fregit by Lorinda Pelton against
Richard D. O'Keefe and others.  There was judgment
for defendants, and plaintiff brings error.  Affirmed by a
divided court.

*Cyrus A. Hovey*, for appellant.

*Avery & Walsh*, for appellees.

HOOKER, J.  The plaintiff, being the owner of a trian-
gular parcel of land at the junction of Eleventh and Water
streets, in the city of Port Huron, brought an action of
trespass against the defendants, under section 11206, 3
Comp. Laws, which reads as follows:

" If any person shall be ejected or put out of any lands
or tenements in a forcible and unlawful manner, or be-
ing put out, be afterwards holden and kept out by force,

or with strong hand, he shall be entitled to maintain an action of trespass and shall recover therein three times the amount of damages assessed by the jury or a justice of the peace in the cases provided by law."

She alleged title in her declaration, and the case was certified to the circuit court by the justice, where a verdict for the defendants was rendered. Plaintiff has appealed.

The defendants are the superintendent of public works, the city engineer, two policemen, and a sidewalk contractor in Port Huron. There are many assignments of error, but the defendants' counsel maintain that the court should have directed a verdict for the defendants, and that therefore they should not be considered. Whether this is a correct conclusion or not, it is proper to consider that question first. The plaintiff bought the premises in 1888. At that time they were used for a pasture, and had a fence along the street, which had stood there some years, and was out of repair. This fence was at once removed by plaintiff's husband, who proceeded to build a house upon the lot. The posts of the fence were taken out, with the exception of a few which were sawed off close to the surface of the ground. About 14 years before the trial the plaintiff's husband built a sidewalk three feet wide, the east side of the walk being three feet west of the line of the fence referred to, which plaintiff claims to have marked the line of her lot. This action grew out of the building of a new cement sidewalk, in place of the old wooden one; the same having been ordered by the common council, and plaintiff having neglected to comply with the ordinance, notice having been served upon her.

An ordinance was in force, fixing the outer edge of walks at seven feet from the street line, and we understand that defendants claim to have adhered to this rule in laying this walk. In doing so, according to plaintiff's testimony, the new walk extended beyond the line of the fence and covered the posts remaining in the ground. Plaintiff offered testimony tending to show that the space

between the walk, when completed, and his house, was only a foot or fourteen inches. That he had graded and sodded the land between the old walk and the house, and had some vines and shrubs, and one evergreen tree, growing upon it, which were disturbed and destroyed by excavating for the walk. He offered testimony tending to show that, upon learning that the men were at work upon the walk, he drove them off with a revolver. At that time his wife was away from home, and the house was locked. He then went to his shop in another part of town, but returned later and a second time pulled up the stakes and forms that he claimed to be on her premises, and while so engaged was told by a policeman to desist, or he would be taken care of, and stopped him under threat of arrest. Plaintiff added to the foregoing the following testimony:

"After they got through with their operations there, my line on the west side of the house 102 feet long and 5 feet wide on the inside of the walk and about 9 feet wide on the outside of the walk was all destroyed, and in order to fix it I had to spend time and labor to draw off the dirt, and the grass was all dead and spoiled."

The new sidewalk lapped over plaintiff's west lot line about 14 inches. The defendants assert:

1. That the testimony does not show that the lot line was on the line of the fence removed in 1888.
2. That the plaintiff's occupancy of the strip of land was not inconsistent with the use of the street by the public, and was not therefore adverse.
3. That, whether the preceding claims are warranted or not, the facts do not support an action under the statute.
4. That a verdict should have been directed for the defendants upon plaintiff's own showing.

It is conclusively established that the center line of Eleventh street was surveyed through this ground at the time of platting. It was in line with certain alleged monuments supposed to be in the center of Eleventh street. It is unimportant whether these monuments were

designed to mark the center of Eleventh street when set. The projection of that line, whatever it was, became the center line of the extension of Eleventh street, as shown by the plat, and as surveyed on the ground. The plat shows an attempt to dedicate 33 feet on each side of the line, and other testimony that it was so surveyed and staked and the street has been since used. The land in dispute is within the 33 feet, and at one time was fenced, as shown, for a few years, but plaintiff removed the fence in 1888, and since that time her occupancy has not been clearly inconsistent with the public rights. There being in the record no evidence except the alleged possession to show that the plaintiff had title to the land, and that possession, such as it was, not being inconsistent with the recognition of the public rights, the court might, with propriety, have so instructed the jury. This renders a discussion of the other questions unnecessary.

The judgment is affirmed.

CARPENTER, C. J., and GRANT and MONTGOMERY, JJ., concurred with HOOKER, J.

BLAIR, J. (*dissenting*). I am unable to concur in the opinion of Mr. Justice HOOKER in this case. I think that, upon the undisputed evidence, the plaintiff was entitled to verdict, and that the court should have directed the jury that the only question for their determination was the amount of damages to be awarded. The trial judge correctly instructed the jury that:

"The actual title of neither the plaintiff nor the city of Port Huron is in issue. * * * The gist of the action against the defendants here, as alleged in the plaintiff's declaration, under the statute I have read to you, is that they gained possession of the land on which the cement sidewalk was afterwards constructed and ejected and put out the plaintiff from her possession in a forcible and unlawful manner and retained the possession thus gained by force."

It is apparent, therefore, that the question of prime importance is whether the plaintiff was in actual and peace-

able possession of some portion of the land described in the declaration, possession of which was taken and held in a forcible and unlawful manner by defendants. I do not think that the testimony admits of two answers to this question.

Plaintiff's husband, Frederick H. Pelton, testified that his wife began to occupy the land described in the declaration on the 1st day of June, 1888, and from that time, until the building of the cement walk, she claimed to be the owner of these premises.

"She owned it and occupied it during all that time. She was in the actual possession of these premises, and that occupation was visible and so that anybody around there could know it and everybody did know it, and her possession was distinct from that of anybody else. * * * When we went there on June 1, 1888, there was a fence around this land. The boards ran lengthwise of the fence on Eleventh street with big, heavy cedar posts. I have given the west line of the premises, and that fence was upon that line. The fence had been there since April, 1885. We went there in 1888. The location of the fence has not been moved either to the east or west since I knew it. * * * I took the fence down and built it into the house for sheeting. I sawed five of the cedar posts off. The stumps of the five posts I sawed off remained in the ground. (Witness produces one of the stumps of the posts.) In building the sidewalk, they pulled out two of them and the other three are under the cement sidewalk that they built. I built a sidewalk on the west side of the property. It was three feet wide, made of good heavy two-inch planks, running lengthwise and stringers running crosswise. This walk I built 14 years ago.

"Q. Before you built that walk, did you apply to the city engineer and receive from him the lines on which you were to build it?

"A. Yes, sir. The walk was three feet west of the fence, that is, the east side of the walk was three feet west of the fence, and the west side of the walk was six feet from the fence. This walk was repaired by me one year prior to the building of the cement walk, by putting in 45 new two-inch planks, and at another time 45 more planks, 90 altogether. It was in first-class condition. Besides building the house and walk, I hired a man to

draw dirt on the land east of these lines and make it up level and grade it and put it in first-class shape up to the walk, three feet outside of the posts. I made a lawn and sowed grass. After I got the lawn and everything in good shape, I started to buy shrubbery. The first I bought was from Mr Rice, and I paid him about $15 for the first order. I set out a Northern spruce tree 13 years ago. It was then 2½ feet high, and, when destroyed, it was 8 feet high. When these people came there and put the new walk in, they pulled it out. It was within the line of the walk that they built. They had to take it out to build the walk. The tree was in the north corner at the intersection of Eleventh and Water streets. I worked with the tree every spring for 13 years, and cultivated it and kept it wired to keep the dogs away from it, and trimmed it and kept it trimmed to bring it into shape, or it wouldn't be worth a dollar. I had on the house some climbing honeysuckles, which formed an arch up to the peak of the house from the corners and extended down, covering the windows. There were two of these plants, each about 40 feet long. They bloomed all summer, all the season. They were in the very finest condition, healthy. I had 20 clematis. There were from three to five sprouts each. There were three that had a good many more than that. They were 13 years old and very fine and about 14 feet high. I had 9 climbing roses. They had on from three to five sprouts, and they ran from six to eight feet in height. I also had five rose bushes, quite large, carrying 8 or 9 sprouts and about 5 feet high, moss roses. They were from 4 to 6 years old. We also had 50 assorted dahlias. They were annuals. They were all planted, ready for blooming. I also had there 3 peonies 13 years old, in thriving condition. The bunches would be as large at the bottom as a patent pail and two feet high.

" *Q.* Did you have there 2 bunches of dielytra spectabilis?

"*A.* Yes; they were 6 years old. My wife brought them from Canada. We also had a row of asters, the rows were two feet by 30. They were just opening up. The bunches of spectabilis were about the size of a patent pail and branched out at the top the size of a half bushel. We also had a row of sweet peas, about 10 feet long, they were on a four-foot wire. We had a 28-foot row of nasturtiums, also 28-foot row of balsams, three double

bunches of hollyhocks, a flower bed containing sweet williams, honeysuckles, and hyacinths. This bed was 7 by 10 feet. * * * The board walk was down very solid, and they had to split the boards up to get them up, they broke and split them every way. What they did not use for fences were thrown into the street, and carried away by Tom, Dick, and Harry. They were digging nearly three-quarters of the way through. There were men here and there digging it out to a depth of about 6 inches and throwing the dirt on the lawn.

" Q. What did they do to your flowers that you described to the jury?

" A. They laid out everywhere. They laid out into the street amongst the dirt, piled right in amongst the dirt, and all through it everywhere. They were destroyed.

" Q. With reference to the line you have given to the jury, the line of the old fence, where were they digging?

" A. They were digging inside of that from my walk to the house, from my walk right up to the house. There was one foot from the house to the walk, and, by the time they took out from 6 to 9 inches and put their timbers down, it brought it up to within 2 or 3 inches of the house, so on the west side of my property there was a space of 9 inches wide took from the line on to my wife's property. This growth of flowers and climbing vines and things that I have described, I found some of them in the street, and some of them hanging there without roots, and the roots cut off, and they all wilted and died, and what they did not tear down, I tore down.

" [That these plants, flowers, and things he spoke of came right up to the line of the old fence on the westerly side of the property in suit, and that that condition had existed for a period of about 12 years prior to the time of the alleged trespass.]

" Q. When you found these doings going on, will you tell the jury what you did?

" A. Well, I went up, and, I think it was Mr. Baker, I asked him and told him, and I took him down to the fence, and I said: 'You are destroying my property there, Mr. Baker.' Well, that wasn't the first. The first thing I done was to grab their lines and throw them out into the street to stop them from working and cutting any more.

" Q. Did you tell them whether to continue work or not?

" A. I told them to stop.

"*Q.* Did you tell them who you were acting for ?

"*A.* Yes, sir.

"*Q.* What did you tell them ?

"*A.* I told them it was my wife's property. She was away from home, and I was there to look after it, and I was going to stop it.

"*Q.* Well, go ahead.

"*A.* I took Mr. Baker to the post, one of these posts that stood up, and I says: 'Do you see there ? There is a post that has stood for 25 years, 20 years to my knowledge.' He says: 'I am sorry for you, but I can't help it.' He says I must take this, it has got to come. Well, I says, 'It won't go.' So I went on pulling up the stuff and throwing it out, and there was a couple were going to come at me with a pick.

"*Q.* Who?

"*A.* Some of the workmen, a kind of foreman, I guess he was. I told them it was going to come up just the same. I says: 'You ain't going to stop it.' So I went in the house•and I came out again prepared for battle, and they went and sat down, and I finished the balance of it.

"*Q.* How were you prepared ?

"*A.* I got a revolver and came out, and I put it in my hip pocket so they could see it plain. I told them I didn't want to do any harm to them, but they were on my property, and they must get off.

"*Q.* Did they get off ?

"*A.* They got off.    *    *    *

"*A.* After I got away, after the police came, they started to put it down again.

"*Q.* Was that still on your wife's property ?

"*A.* Yes.

"*Q.* What did you do then ?

"*A.* Well, the police had passed me and didn't know me, going to my shop. I came on and finished it up again, so I was just taking up the last stake when one of those policemen, he jumped on me, and he said: 'Here, don't touch another thing here. If you do,' he says, 'you will be taken care of.'

"*Q.* How did he say you would be taken care of ?

"*A.* I just forget what he did say, but he stopped me from doing anything more. I think he said he would arrest me, I think that is the words he used. I took him to the post and showed him. I said: 'Would you arrest me for trying to protect my property ?' He says: 'We

can't help it.   We have got our orders from the city attorney to put this walk down.'   Well, thinks I, I guess I will let it take the legal way, and from that I entered suit. These policemen were Fred Keener and Albert Trapp. After they got through with their operations there, my line on the west side of the house 102 feet long and five feet wide on the inside of the walk and about 9 feet wide on the outside of the walk was all destroyed, and, in order to fix it, I had to spend time and labor to draw off the dirt, and the grass was all dead and spoiled, sand with clay on top, and I had it all taken away."

James Baker, who had charge of constructing the walk, testified:

"I put the walk down where the stakes set by the city engineer indicated that it should go.   *   *   *   We had to take some sod off the east side of the old sidewalk, and we also had to dig up some few flowers around there, a couple of places where they came out to the walk or pretty near to the walk.   *   *   *   We didn't get over any further than was necessary to build the sidewalk.   We have to have from 3 to 4 inches outside of the sidewalk for room for our rails; 2 by 4 we put in each side of the walk. *   *   *   We drove stakes at the outside and put the rail to those stakes.

"*Q.* So that it is necessary for you to cut the sod out about how many inches?

"*A.* From 3 to 4 inches.

"*Q.* Outside of the walk itself?

"*A.* Yes, sir.

"*Q.* Will you go on and tell the jury just how much in the way of flowers and shrubs and things of that kind it was necessary and you did cut away there, in order to lay this walk?

"*A.* Well, there was a few flowers along there, alongside of the house, and also some south of the house at the back of the other house, at the back of both houses.   They came out pretty near to the old walk.   My men dug the flowers up and laid them over on the lawn inside of the yard.

"*Q.* Can you tell the jury about how many inches of lawn, or how much lawn, you had to cut away?

"*A.* Well, it would be about three feet.   It might be a trifle over that."

Mrs. Lorinda Pelton, the plaintiff, testified as follows:

"I am the plaintiff in this suit, and the wife of Fred H. Pelton. We have been in Port Huron 20 years next April. I heard the testimony of my husband with respect to the beginning of work and the occupation of this property that he described, and I also remember the fence. I saw that fence about the second day after we came to Port Huron; that would be 20 years ago, the 1st of next April, or April 1, 1885. The flowers, shrubs, vines, and things that have been destroyed by my husband and others have extended up to the line of the fence for about 13 years. I did not see Mr. O'Keefe around the house, and on the west side of my property shortly before the cement walk was built, but I did see him there about a year before that. I remember the original sidewalk; that it was repaired. There were no holes in it, nor any wide cracks nor any rotten places, nor anything except the ordinary weathering of the walk."

This testimony was undisputed, and from it it appears conclusively that at the time plaintiff purchased this property and began her occupancy of it, the west line was plainly defined by a board fence, the line of which was readily determinable from the cedar posts remaining in the soil at the time of the alleged trespass, and to which the attention of the persons building the walk and the police officers, who compelled plaintiff's husband to desist from protecting her property, was expressly called.

As said by this court in *Beecher* v. *Galvin*, 71 Mich. 391:

"There are other ways of holding possession of land besides inclosing it with a fence."

See, also, *Sauers* v. *Giddings*, 90 Mich. 50. Aside from maintaining a fence, the plaintiff did all that was possible to manifest to the community a claim to the possession of the land up to the line of this fence. She constructed a sidewalk, the inner edge of which, in accordance with the city ordinance, was three feet from where she claims her west line was located, and the line of this walk was given to her by the city engineer. After the construction of this walk, she planted trees, perennial

flowers, vines, and shrubs, of the value, according to the testimony of a man conceded to be an expert, of $200, between the sidewalk and the house, and, admittedly, upon the strip of land in question. It is true that some of the plants encroached upon the space between the sidewalk and the west line, and, if the defendants had built this walk without notice of where the true line actually was, a different question might be presented. In this case, however, they were notified where the true line was, by the most unmistakable evidence, the cedar posts fixed in the earth, to which their attention was called by plaintiff's husband. After being so notified of where plaintiff's line actually was, according to his contention, if they proceeded further, they did so at their peril. There is no evidence in this case of any custom on the part of lot owners, in Port Huron, or elsewhere, to plant trees, shrubs, and vines manifestly intended to be permanent between the lot lines and the sidewalk lines, and it would be unreasonable to suppose such a custom. The natural presumption is that, when a property holder makes permanent improvements, he supposes he is making them upon his own property. It has become customary in cities to remove street fences, and I am not willing to hold that thereby the title and possession of property is in anywise changed or imperiled. Certainly when the lot owner, after taking down his fence, plants permanent trees, shrubs, and vines which come up to the line of the fence, and maintains them there for 13 or 14 years, it cannot be said that his possession is in doubt. It further appears that the contractor in constructing this walk, dug out and occupied with the side planks three or four inches of land unquestionably belonging to the plaintiff and cast earth upon her lawn along the front of her property. This he had no lawful right to do, and his so doing was a trespass. *Clark* v. *Wiles*, 54 Mich. 323; *Davies* v. *City of East Saginaw*, 66 Mich. 37; *Mathewson* v. *City of Grand Rapids*, 88 Mich. 558. It is not a sufficient answer to say that such occupation was merely temporary

and incidental to the construction of the walk, since it destroyed plaintiff's permanent improvements, which would require many years for their restoration.

Thus far I have proceeded upon the theory that the east line of the sidewalk as laid was the true line. I do not find any evidence in this case, however, to indicate that the line of posts did not mark the true line of plaintiff's property. It was not attempted to show that the city of Port Huron, or the municipal authorities, or the public, had ever established the east line of Eleventh street in front of this property where the east line of the sidewalk was laid by them. The only attempt which was made to defend the line as established by the defendants was by introducing evidence of a certain alleged plat and surveys. The plat was properly held by the court to be defective, and that the lands were not dedicated thereby, and it was only received as a de facto plat. This plat purports to have authorized:

" Marcus Young, civil engineer, to subdivide said land, of which the within map is a correct representation of such subdivision, drawn to a scale of 100 feet to the inch."

Young testifies:

" I never attended any institution where they teach civil engineering. I never had any education. I never attended any school after I was 11 years of age. What information I have got I have got it outside of schools. I never studied as a civil engineer more than in my line of business, which for 35 years has been the real estate business. I think Sands Carpenter drew the description for that plat. I do not know the name of the instrument that Mr. Carpenter used in making the survey. I helped hold the stakes and carried the chain, and did whatever Mr. Carpenter directed. I was assisting him. Mr. Carpenter had charge of the instrument, and under his direction we drove the stakes and set the pickets and carried the chain wherever he said was right."

Mr. Carpenter was the engineer who actually made this survey, and it is apparent that Young could not possibly have known whether the lines as run by Carpenter were

correct or not. It does, however, clearly appear that Eleventh street, according to the scale of the plat, was not a 66-foot street. The principal witness for defendants, the then city engineer, Phelps, testified as follows:

" The witness scaled the plat and testified that Eleventh street scaled 63 feet; that is, 63 feet would be the nearest foot. It would not be more than 64 feet nor less than 63 feet. Twelfth street scales 66 or 67 feet; Ward street, 66 feet; Young street, 68 feet. It is marked on the map 66. The lots which are marked on the map as 54-foot lots scale 55 feet, 52, or 53 feet, 52 feet, 53 feet, 52 feet plus, 52 feet, 52 feet, 52 feet, so that these seven lots, supposed to be 51 feet wide each, hardly any two of them agree. This map is not carefully drawn to a scale."

Young, who was the only witness who testified as to the original survey for the plat, testified that they projected Eleventh street through this plat from posts at the center of Howard and Eleventh and Griswold and Eleventh streets. What kind of posts they were, he could not tell.

" After we had run around this land on these lines, and had taken these two posts or stakes, or whatever they were, as guides, we attempted to run a line up what we thought was the center of Eleventh street north, we ran that line across the plat to the north side of Ward's land, where it intersected the fence along Water street.

" *Q.* Now, if these posts that you took as guides were not set in the right places, your line would not be right, would it?

" *A.* No.

" *Q.* And whether they were set in the right place, you don't know, do you?

" *A.* No, sir."

There is no legitimate evidence in the case that Eleventh street, as actually established by user, or as originally surveyed, was a 66-foot street. The line of the sidewalk was therefore determined upon a false basis, by assuming that the center line of Water street, as determined by the city engineer, was the center line of a street which was actually thirty-three feet wide on each side thereof.

" Measured 26 feet to the sidewalk. We set out stakes 25½ from the center, and then we built the walk six inches from the center. We set them 25½ from the center of the street, and then they set the walk six inches from the stake, and they didn't disturb the stakes.

"Q. That is marking the outside edge of the sidewalk?

"A. Seven feet from the street line, yes. I did that all along the line where this new sidewalk was being built. In this case we ran along one line, and that was the outside line.

## "CROSS-EXAMINATION:

"Q. In setting those stakes, or in fixing the center line of Eleventh street, you didn't pay any attention to the occupation at all on the sides of the street, did you?

"A. Not at that time.

" Q. Not when you set these stakes or made these measurements for the sidewalk?

"A. No, I think not.

" Q. Nor you didn't take into consideration any old fences, if any?

"A. I think not at that time.

" Q. Nor the occupation on the west side of Eleventh street of Lomasney or any of those people?

"A. I don't think we did when we staked out this walk.

" Q. Nor you did not take into consideration any occupation on the east side of Eleventh street?

"A. Not that I remember of.

" Q. You simply arbitrarily fixed that line where you said was the center of Eleventh street, is that true? That calls for yes or no?

"A. Yes, where I say the center line is, yes."

It was further testified by Mr. Phelps:

" There are two different lines of sidewalk on the west side of Eleventh street, namely, the one running by the Mennonite Church, and one south. I don't think there are sidewalks upon three different lines of that street and all given by me. I originally gave the line 26 feet from the center of the street, but for some reason it was afterwards moved."

As I understand the record, although the width of the new walk is not definitely stated, it was four feet wide. Baker, the contractor, who put the walk down, testified:

"*Q.* As I understand it, this new line of this walk was a little further to the east than the old walk ?

"*A.* Yes, about three feet to the east.

"*Q.* It got over three feet ?

"*A.* About three feet.

"*Q.* From where the old walk had been ?

"*A.* Yes."

As stated in defendants' brief:

"The situation is that for some years an old wooden walk extended on the east side of Eleventh street. Between this walk and plaintiff's house there was a distance of about four feet. When the new walk was built, it was placed about three feet further to the east. This brought it up to about a foot from plaintiff's house.

Since the west line of the new walk was located by the city engineer, Phelps, as being seven feet west of the east line of Eleventh street, it is apparent that the east line of Eleventh street, according to his survey, would cut off two feet of plaintiff's house.

I think the judgment should be reversed, and a new trial granted.

McALVAY, OSTRANDER, and MOORE, JJ., concurred with BLAIR, J.